## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRYL BROWN | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO.  07-0192 |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER S. J.                                                    January 29, 2008


_____Currently pending before the Court is the Motion of Defendants City of Philadelphia and

Sergeant Brian Murphy for Summary Judgment against Plaintiff Darryl Brown.  For the following

reasons, the Court grants Defendants' Motion in its entirety and dismisses the remaining defendants

from suit.

## I.    STATEMENT OF UNDISPUTED FACTS[1]

On the afternoon of January 23, 2005, residents in the area of 51st and Lancaster Streets

reported an attempted robbery and impersonation of police officers.  (Def. Mem. Supp. Summ. J.

Ex. A.)  The police incident report described the suspects as four black males, one of whom was

dark-skinned, heavy-set and wearing a tan jacket with fur around the hood.  (Id.)  This information

was transmitted over the police radio.  (Def. Mem. Supp. Summ. J. Ex. B.)  Defendant Sergeant

---

[1]  This summary was compiled from the briefs and exhibits submitted by both Plaintiff
and Defendants.  To the extent the parties have submitted conflicting evidence, the Court
considers such evidence in the light most favorable to Plaintiff, pursuant to Federal Rule of Civil
Procedure 56.

Brian Murphy, who was in the area of the crime at the time, heard the flash information[2] regarding the attempted robbery and the description of one of the perpetrators.  (Murphy Dep. 11:7-12:15, Oct. 17, 2007.)  Defendant Murphy proceeded to a nearby location and observed Plaintiff walking down the street wearing a tan jacket with fur around the collar.  (Id. at 12:20-23)  According to Plaintiff, he had just finished working a double shift and he was leaving his home to go to a beer distributor. (Brown Dep. 12:16-24, Oct. 17, 2007.)  Plaintiff parked his car near the beer distributor at the corner of Lancaster and Marion, one block from the attempted robbery, but noticed that it was closed.  (Id. at 13:20-14:5.)

As Plaintiff walked back to his car, Defendant Murphy approached him and told him to stop and face the wall of the beer distributor.  (Brown Dep. 16:12-17:3.)  Defendant Murphy had his hand on his gun and Plaintiff recognized him as a police officer.  (Id. at 16:18-24.)  In response to Plaintiff's inquiry as to the basis for the stop, Defendant Murphy replied that an attempted robbery had just occurred.  (Id. at 17:19-21.)  When Plaintiff indicated that he had just gotten off from work, Defendant Murphy remarked that he did not care and told him to get up against the wall.  (Id. at 17:21-18:7.)  Plaintiff put his hands out against the wall and spread his legs.  (Id. at p. 18:8-17.) Although Defendant Murphy testified that Plaintiff became irate and was cursing, (Murphy Dep. 17:20–22), Plaintiff indicated only that he was upset, but never cursed or got belligerent.  (Brown Dep. 18:21-25.)  Defendant Murphy then began to frisk Plaintiff for weapons, starting from the top and going down.  (Murphy Dep. 19:11-22.)  To make sure Plaintiff could not move, Defendant Murphy kept one hand on his arm and had him pressed up against the wall while he was patting him down.  (Brown Dep. 19:3-25.)  He also had a hold of Plaintiff's jacket.  (Id. at 20:2-11.)  Two other

---

[2] Officer Murphy defined "flash information" as "[i]nformation that was given to police radio from a victim or a witness."  (Murphy Dep. 12:5-6.)

officers arrived, grabbed each of Plaintiff's arms and further pinned him against the wall. (Id. at 19:3-20:22.) At one point, Defendant Murphy asked Plaintiff for information, including his name, age, date of birth and address. (Murphy Dep. 20:10-22.) He also asked Plaintiff for identification, but was unable to secure anything but a bank card. (Id. at 20:23-21:7.) Defendant Murphy patted him down a second time. (Brown Dep. 22:9-23:8.) Every time Plaintiff attempted to turn around, the other officers applied more force to him and kept him up against the wall. (Id. at 21:19, 23:14-25:23.) Plaintiff indicated, however, that the officers never used any other force against him other than pushing him against the wall. (Id. at 25:14-23.) Likewise, he conceded that Officer Murphy had no other physical contact with him other than the frisks and pushing him back against the wall when he tried to turn. (Id. at 29:14-30:18.)

Thereafter, other police cars arrived at the scene and Defendant Murphy approached one of them. (Id. at 21:15-19.) The victim, who was in one of the cars, affirmatively stated that Plaintiff was not among the men who had attempted the robbery. (Murphy Dep. 20:2-6, 24:22-25:5.) Defendant Murphy then patted Plaintiff down a third time, returned his bank card and released him. (Brown Dep. 23:2-7.) According to both the Police Incident Report and Officer Murphy's testimony, fourteen minutes elapsed from the initial detention to the ultimate release. (Murphy Dep. 21:8-22:9, 24:15-21; Def. Mem. Supp. Summ. J. Ex. B.) Immediately upon release, Plaintiff went to a phone booth and called 9-1-1 to report the events. (Brown Dep. 27:20-24.) As a result of this call, an officer arrived at Plaintiff's house later that day and took his information regarding the incident. (Id. at 33:8-34:17.)

Approximately four days after these events, Plaintiff sought medical attention for pain in his shoulder and neck. (Id. at 35:24-37:10.) He sporadically missed a few days of work and received six months of treatment and medication as a result of his injuries. (Id. at 39:20-23, 41:4-43:13.)

3

On December 15, 2006, Plaintiff commenced the instant action in the Court of Common Pleas of Philadelphia County, Pennsylvania, against the City of Philadelphia, Officer Murphy and the two unknown officers alleging:  (1) assault and battery; (2) false imprisonment; and (3) violations of his federal constitutional rights, including the freedom from excessive force and summary punishment, the freedom from the deprivation of liberty without due process of law and the freedom from illegal search, seizure and arrest.  Plaintiff also claimed that Defendant Murphy acted with malice or reckless disregard for his rights.  The case was removed to federal court on January 16, 2007.  Following the completion of discovery, Defendants City of Philadelphia and Officer Murphy filed the present motion for summary judgment on November 8, 2007.  By way of his Response, Plaintiff has conceded that he is unable to establish any claims against either the unidentified officers Doe and Roe or against Defendant City of Philadelphia.  (Pl. Mem. Opp. Summ. J. 16.)  As such, the Court dismisses the Complaint against these defendants and now addresses the claims against the remaining defendant, Officer Murphy.

## II.    STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle do a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For there to be a "genuine" issue, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny,

4

Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir.1993). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## III.   DISCUSSION

### A.   Section 1983 Claims

"Section 1983 'is not a source of substantive rights,' but merely provides 'a method for

vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94, 109 S.

Ct. 1865, 1870 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694, n.3

(1979)).  In order to state a cause of action under section 1983, a plaintiff must demonstrate both

that "(1) the defendants acted under color of [state] law; and (2) their actions deprived [the plaintiff]

of rights secured by the Constitution or federal statutes." Anderson v. Davila, 125 F.3d 148, 159

(3d Cir. 1997); see also 42 U.S.C. § 1983 (1996).

Plaintiff, in the case at bar, alleges that Defendant Murphy, while acting under color of law,

deprived him of his rights, privileges and immunities granted to him as a citizen of the United States

– violating, in particular, his right to be free from illegal search, seizure and deprivation of liberty

without due process of law and his right to be free from excessive force and/or summary

punishment.  The Court considers each claim in turn.

**1.      Deprivation of Liberty and Illegal Search and Seizure**

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, Ker

v. California, 374 U.S. 23, 30, 83 S. Ct. 1623, 1628 (1963), provides, in pertinent part, that the

"right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV.  In order to establish a

claim under the Fourth Amendment, a plaintiff must show that the actions of the defendant: (1)

constituted a "search" or "seizure" within the meaning of the Fourth Amendment, and (2) were

"unreasonable" in light of the surrounding circumstances. Brower v. County of Inyo, 489 U.S. 593,

599, 109 S. Ct. 1378, 1382 (1989).  A seizure is a restraint of liberty by show of force or authority.

U.S. v Mendenhall, 446 U.S. 544, 553, 100 S. Ct. 1870, 1877 (1980), and occurs "when a

reasonable person in the position of the plaintiff would not feel free to decline a request of a

6

government agent or to terminate an encounter with a government agent." <u>Brown v.</u>

<u>Commonwealth</u>, No. 99-CV-4901, 2000 WL 562743, at *4 (E.D. Pa. May 8, 2000).

The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but

only against unreasonable searches and seizures.  Pursuant to the rule announced in <u>Terry v. Ohio</u>,

392 U.S. 1, 88 S. Ct. 1868 (1968), a police officer may stop an individual and initiate a brief

investigatory detention if the individual's behavior raises a reasonable suspicion of criminal activity.

<u>Id.</u> at 21-24, 88 S. Ct. at 179-1881.  So-called "<u>Terry</u> stops" are reasonable "not only because of the

government's interest in investigating and alleviating officers' suspicions of illegal activity but also

because of the limited intrusiveness of such stops." <u>U.S. v. Smith</u>, 799 F.2d 704, 711 (11th Cir.

1986).  To maintain the balance between the competing interests of the government and the

individual, each <u>Terry</u> stop must be both "justified at its inception" and "reasonably related in scope

to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 20.

Plaintiff challenges both aspects of his detention, alleging that (1) the initial stop was not

supported by reasonable suspicion and (2) the <u>Terry</u> stop exceeded its scope, thus resulting in a de

facto arrest without probable cause.

### a.      Whether Reasonable Suspicion Justified the Stop

"[T]he Fourth Amendment does not require a policeman who lacks the precise level of

information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime

to occur or a criminal to escape." <u>Adams v. Williams</u>, 407 U.S. 143, 145, 92 S. Ct. 1921, 1923

(1972).  On the contrary, "it may be the essence of good police work to adopt an intermediate

response," i.e., to maintain the status quo with a brief stop that allows the police officer to

investigate further the possibility of criminal involvement.  <u>Id.</u> at 145-46, 92 S. Ct. at 1923.  An

7

investigatory stop is therefore consistent with the Fourth Amendment whenever the police officer

has "a reasonable, articulable suspicion that criminal activity is afoot." U.S. v. Goodrich, 450 F.3d

552, 559 (3d Cir. 2006). This rule applies whether the criminal activity is ongoing or has already

been completed, see id. at 553 (crime in progress); U.S. v. Brown, 448 F.3d 239, 244 n.7 (3d Cir.

2006) (completed felony), and it is legally insignificant that the detainee is not ultimately identified

as the perpetrator. U.S. v. Robertson, 305 F.3d 164, 169 (3d Cir. 2002). Calculating whether an

officer has reasonable suspicion to warrant a stop and search is often an abstract and imprecise

judgment. U.S. v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002). It encompasses a "less

demanding standard than probable cause and requires a showing considerably less than

preponderance of the evidence"; only a "minimal level of objective justification" is necessary for a

Terry stop. U.S. v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006) (internal quotes and citations

omitted).

Reasonable suspicion must be measured by the totality of the circumstances. U.S. v.

Sokolow, 490 U.S. 1, 8, 109 S. Ct. 1581, 1585 (1989). An officer is entitled to draw reasonable

inferences from the facts in light of his experience. Terry, 392 U.S. at 27. Additionally,

information given to the police by a witness or an informant can justify a stop if it bears the indicia

of reliability. Adams, 407 U.S. at 146-47; U.S. v Coker, 223 Fed. Appx. 136, 139 (3d Cir. 2007).

Such indicia are generally found "[w]hen the victim of a street crime seeks immediate police aid and

gives a description of his assailant." Adams, 407 U.S. at 147. Confronting inquiries into the

validity of Terry stops, courts have repeatedly found that the combination of an individuals's time

and place proximity to the crime with his or her match to a flash description provided reasonable

suspicion. See, e.g., U.S. v. Ayala, 169 Fed. Appx. 717, 719-720 (3d Cir. 2006) (informant's

complaint that a Hispanic man, wearing an orange shirt and dark jeans, had threatened to shoot him only moments ago and only three blocks from the officers' location, provided reasonable suspicion to stop person at nearby corner who matched the description provided by the informant); U.S. v. Gardner, 76 Fed. Appx. 401, 403 (3d Cir. 2003) (flash information about robbery committed by a six-foot tall black male with an afro, white T-shirt with black label on back and blue jeans, combined with officer's observation, ten minutes later and four blocks from the scene of the crime, of a seemingly tall black male with an afro and white T-shirt, sufficient to justify Terry stop); U.S. v. Harple, 202 F.3d 194 196-197 (3d Cir. 1999) (finding reasonable suspicion to stop Oldsmobile where there was temporal and geographical proximity of Oldsmobile to site of arson, the car was in an otherwise desolate area, the car substantially matched the description which the officers had received from another officer, the car started moving in an unusually careful manner, and the car, consistent with briefing received by the officers, carried several white males who appeared young); U.S. v. Foxwell, No. 04-CV-241, 2004 WL 1858341, at *1-2 (E.D. Pa. Aug. 4, 2004) (flash report that the three persons involved in a robbery were black males dressed in black clothing who had taken complainant's baby-blue colored Avirex jacket and his wallet, combined with arresting officers' observation of defendant, who was a black man, wearing black clothing, carrying a baby-blue jacket only six blocks and thirty minutes from the scene and time of the robbery justified a Terry stop); Avery v. Mitchell, No. 98-CV-2487, at *3-4, 1999 WL 240339 (E.D. Pa. Apr. 20, 1999) (where (a) dispatch information described suspects as two armed black males wearing dark clothing, (b) plaintiff's car, carrying two black males, was moving in the area minutes after the robbery report and (c) officers discovered that license plate was registered to a different vehicle, reasonable suspicion existed even though detainees were wearing their white cooks' uniforms).

9

In light of this jurisprudence, the Court finds that reasonable suspicion existed to support Officer Murphy's <u>Terry</u> stop of Plaintiff.  Defendant Murphy received a radio call at approximately 1:00 p.m. on January 23, 2005, indicating that four armed men were trying to knock down a door at 5049 Lancaster Avenue to commit a home invasion robbery.  (Murphy Dep. 11:10-15.)  The flash information indicated that one of the suspects was a dark-skinned, black male wearing a tan jacket with fur around the hood.  (Def. Mem. Supp. Summ. J. Exs. A and B.)  Immediately after receiving this call, Defendant Murphy went to a location one block from the scene, where he observed Plaintiff, alone, in the middle of the 5000 block of Lancaster Avenue, wearing a tan jacket with fur around the collar.  (Murphy Dep. 12:16-13:14.)  Given the proximity in space and time to the scene of the crime and the similarity to the description in the broadcast, the Court concludes that Defendant Murphy had a particular and objective basis for believing that criminal activity was afoot and that Plaintiff was among the perpetrators.

In an attempt to establish otherwise, Plaintiff cites to four alleged inconsistencies: (1) the flash information indicated that Plaintiff was traveling west of 51st Street, but he was stopped east of 51st Street; (2) the flash information stated that police were looking for four black males, yet Plaintiff was alone; (3) Plaintiff's jacket had fur in his hood and not around the collar, as testified to by Officer Murphy; (4) the flash information described a heavy-set individual and Plaintiff was not heavy-set.  (Pl. Mem. Opp. Summ. J. 12.)  Although these discrepancies are seemingly relevant in hindsight, our Fourth Amendment jurisprudence "demands that we 'prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure.'"  <u>U.S. v. Montoya de Hernandez</u>, 473 U.S. 531, 559, 105 S. Ct. 3304, 3320 (1985) (quoting <u>U.S. v. Martinez-Fuerte</u>, 428 U.S. 543, 565, 96 S. Ct. 3074, 3086 (1985); <u>see also</u> <u>See</u> <u>Guidry v. Boyd</u>, No. 06-CV-1600, 2007 WL 2317174, at

*7-8 (N.D. Ill. Jul. 17, 2007) (collecting cases where minor discrepancies between description of suspect and detainee's description was insignificant for purposes of reasonable suspicion).

Considered in this light, the discrepancies identified by Plaintiff are either easily reconcilable by an officer acting in the heat of the moment or are facts that do not negate the existing reasonable suspicion. For example, the fact that Plaintiff was not found with the other three perpetrators and was located going in a different direction than described in the incident report could easily have been explained by a reasonable belief that the suspects had scattered when fleeing the scene. Indeed, Officer Murphy testified that "[i]f [Plaintiff] was with anybody else, [he] would have stopped them too." (Murphy Dep. 14:5-7.)  The same holds true for Officer Murphy's repeated references at his deposition that Plaintiff's jacket had fur around the collar, when Plaintiff actually had fur around his hood.  (Id. at 11:18-12:25; Brown Dep. 15:14-16.)  Both the complainant's report and flash report transmitting the information to Officer Murphy indicated that the suspect had a tan jacket with fur around hood.  (Def. Mem. Supp. Summ. J. Ex. A and B.)  Simply because Officer Murphy committed the semantical error of referring to "fur around the collar" does not undermine his actions.  Finally, the fact that the radio call indicated that the perpetrator was "heavy-set" did not, despite Plaintiff's thin stature, vitiate reasonable suspicion.  (Murphy Dep. 15:11-16:4.)  Upon seeing Plaintiff at the deposition, Officer Murphy testified that he recalled Plaintiff being heavier at the time.  He also testified that, on the day of the incident, it was hard to properly observe Plaintiff's weight since it was snowing and Plaintiff was wearing a thick jacket.  (Id. at 14:5-15:4.)  Accordingly, given the information available to Officer Murphy at the time, the Court finds, as a matter of law, that the initial stop was constitutional.

**b.**   <u>Whether the Stop Was Reasonably Related in Scope</u>

In an alternative argument, Plaintiff contends that the <u>Terry</u> stop exceeded its scope.  When police officers make an investigative stop, they may take such steps as are "reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop."  <u>U.S. v. Hensley</u>, 469 U.S. 221, 235, 105 S. Ct. 675, 683-684 (1985).  If, however, police exceed the least-intrusive means of detention and/or investigation, a <u>Terry</u> stop can ripen into an arrest.  <u>See</u> <u>U.S. v. Sharpe</u>, 470 U.S. 675, 685-86, 105 S. Ct. 1568, 1575 (1985).  The line between a proper <u>Terry</u> stop and an improper de facto arrest is elusive and not easily drawn.  <u>Id.</u> at 685, 105 S. Ct. at 1575.  Accordingly, courts must consider (1) the duration of the stop; (2) the law enforcement purposes justifying the stop; (3) whether the police diligently sought to carry out those purposes given the circumstances; and (4) alternative means by which the police could have served their purposes.  <u>Id.</u> at 684-87; <u>U.S. v. Leal</u>, 235 Fed. Appx. 937, 941 (3d Cir. 2007), <u>pet. for cert. filed</u> (Nov. 28, 2007).

As to duration, the Supreme Court has explained that a <u>Terry</u> stop must be temporally limited and that a lengthy detention "must be based on consent or probable cause."  <u>Dunaway v. NY</u>, 442 U.S. 200, 212, 99 S. Ct. 2248, 2256 (1979).  There is, however, "no rigid time limitation on <u>Terry</u> stops."  <u>Sharpe</u>, 470 U.S. at 685.  Rather, the inquiry considers the nature of the investigatory actions of the police, i.e., "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  <u>Id.</u> at 686.  A stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers."  <u>Id.</u> at 687.  Generally, however, courts have found that stops lasting an hour or less do not exceed <u>Terry</u>'s bounds.  <u>See, e.g.</u>, <u>Leal</u>, 235 Fed. Appx. at 942 (investigative stop of one hour and twenty minutes, while officers

12

waited for canine unit to investigate individual's car for drugs "may have bumped up against the outer limit of a <u>Terry</u> stop, but it did not cross it"); <u>U.S. v. McGrath</u>, 89 F. Supp. 2d 569, 578-79 (E.D. Pa. 2000) (<u>Terry</u> stop of one hour prior to formal arrest in order to dispel or confirm suspicions was not excessive); <u>U.S. v Burton</u>, 193 F.R.D. 232, 239-40 (E.D. Pa. 2000) (<u>Terry</u> stop of less than one hour, during most of which officers waited for the arrival of the drug-sniffing dog, did not cause stop to ripen into an arrest).

"The limitation on 'scope' is not confined to the duration of the seizure; it also encompasses the manner in which the seizure is conducted." <u>Illinois v. Caballes</u>, 543 U.S. 405, 419, 125 S. Ct. 834, 844 (2005). The fact that a suspect may not feel free to leave does not turn a <u>Terry</u> stop into an arrest, for "in neither a stop nor an arrest is a suspect free to leave." <u>U.S. v. Edwards</u>, 53 F.3d 616, 619 (3d Cir. 1995). Moreover, a police officer is permitted to frisk for weapons for his own protection "where he has reason to believe he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." <u>Terry</u>, 392 U.S. at 27. The officer need not be absolutely certain that the individual is armed; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Id.</u>

Finally, "[a]n officer may use reasonable physical force under the circumstances to effect a <u>Terry</u>-stop without converting the stop into an arrest. So long as the circumstances warrant the precautions, such conduct . . . does not necessarily exceed the bounds of a <u>Terry</u>-stop." <u>U.S. v. McGrath</u>, 89 F. Supp. 2d at 577-78. "[D]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197-98 (11th Cir. 2002).  Pointing

guns at or handcuffing detainees does not, per se, constitute an arrest.  <u>Baker v. Monroe Twp.</u>, 50

F.3d 1186, 1193 (3d Cir. 1995).  Courts have generally permitted officers to use reasonable force,

during a <u>Terry</u> stop, to detain a suspect and determine if he has been involved in a crime.  <u>See</u>, <u>e.g.</u>,

<u>Gallegos v. City of Colorado Springs</u>, 114 F.3d 1024, 1030 (10th Cir. 1997) (holding that use of an

"arm bar maneuver" and forcing detainee down on the pavement held not sufficient to elevate a stop

into an arrest); <u>Burton</u>, 193 F.R.D. at 238-39 (finding that officer approaching detainee with his

weapon drawn, handcuffing him and placing him in a police car for less than an hour did not exceed

<u>Terry</u> stop where officers suspected that detainee was involved in drug trafficking and needed to

secure the area).

  As noted above, Officer Murphy received a radio call for "four armed men" attempting to

commit a home invasion robbery.  (Murphy Dep. 11:10-15.)  Upon confronting Plaintiff near the

scene of the crime, Officer Murphy ordered him to put his hands up against the wall with his legs

spread.  (Brown Dep. 18:8-17-19.)  Officer Murphy then held him with one arm and patted him

down with the other.  (<u>Id.</u> at 19:3-35.)  While this frisk was occurring, two other officers arrived,

searched Plaintiff and found his bank card, but no other identification.  (<u>Id.</u> at 20:14-21:5.)  As the

other two officers held him, Officer Murphy frisked him a second time.  (<u>Id.</u> at 22:9-23:5.)  Shortly

thereafter, the complainant arrived and indicated that Plaintiff was not one of the perpetrators.  (<u>Id.</u>

at 30:19-31:6; Murphy Dep. 24:22-25:5.)  Once the complainant left in the police car, Officer

Murphy frisked Plaintiff again and immediately released him.  (Brown Dep. 31:9-17.)  The whole

incident lasted a total of fourteen minutes, from Officer Murphy's initial stop of Plaintiff to his

ultimate release.  (Murphy Dep. 21:15-18, 24:15-18.)[3]

These facts, considered in light of the aforementioned jurisprudence, mandate a conclusion that the <u>Terry</u> stop did not exceed the least-intrusive means of detention.  Plaintiff was held for approximately fourteen minutes – far less than detentions condoned in other cases.[4]  Nothing within the evidence presented suggests that Officer Murphy was dilatory in his investigation; indeed, most of the delay was attributable to the officers' waiting for the complainant to arrive at the scene. Finally, Officer Murphy diligently used a minimally instrusive means of determining whether Plaintiff had, in fact, committed the crime.  Having been told that the suspect was armed, Defendant Murphy harbored a reasonable concern for his safety.  Accordingly, his one-handed initial pat down, followed by the subsequent frisk after the other officers arrived, constituted appropriate precautionary measures.  Any force used by Officer Murphy to keep Plaintiff at the scene until the complainant arrived to confirm or dispel suspicions was justified, particularly in light of Plaintiff's own testimony that he was "upset" by the stop and kept trying to turn around to see what was occurring.  (Brown Dep. 18-21, 26:4-10.)  While the third alleged frisk was perhaps unnecessary, the Court cannot, acting in hindsight, find that this additional, de minimis delay converted the stop into an arrest.  We thus grant summary judgment in favor of Defendant Murphy on this claim.[5]

_____

[3] Notably, Officer Murphy testified that he only patted Plaintiff down one time and that no other officers touched Plaintiff.  (Murphy Dep. 26:3-13.)  In summary judgment proceedings, however, the Court must credit Plaintiff's version of the facts.

[4] Plaintiff testified that the incident "seemed like a longer time" than fifteen minutes, but offered no conflicting estimate of how much longer he believed it to be.  (Brown Dep. 27:8-10.) Such a vague allegation, in the face of concrete evidence from Defendants, fails to establish a genuine issue of material fact.

[5] Plaintiff cites extensively to the Pennsylvania Superior Court case of <u>In the Interest of S.J.</u>, 624 A.2d 1068 (Pa. Super. 1983) as support for the proposition that the stop was generally

**2.      Excessive Force/Summary Punishment**

The second aspect of Plaintiff's section 1983 claim alleges that Officer Murphy deprived

him of his right to be free from unreasonably excessive force and summary punishment.  The Fourth

Amendment prohibits the use of unreasonably excessive force when making an arrest.  Graham v.

Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989).  Whether a police officer used

---

unconstitutional.  The court in that case found that "the observance of no 'unusual conduct' by
[the defendant officer] which, when coupled with the innocuous behavior of [detainee's] mere
presence at the stated location matching a '911' caller's description of one selling and possessing
drugs, would lead a reasonable person to conclude that criminal activity was afoot."  Id. at 1071.
Accordingly, the court held that "[t]here is no disputing the fact that, given the information
received, the police, as part of good investigative procedures, were 'allowed to 'stop' [detainee]
and detain [her] briefly for questioning upon suspicion that [s]he may be connected with criminal
activity.'"  Id.  The court, however, noted that when the defendant officer "failed to observe any
conduct corroborating the radio dispatch of criminal activity attributed to [detainee], and when
his questioning of [detainee] did not disclose evidence (e.g., furtive activity, evasive conduct
and/or erroneous information to his questions) indicative of criminal activity, the police had no
reason to detain [her] any longer, nor search the inside of her jacket."  Id.

    This case fails to aid Plaintiff's efforts to avoid summary judgment.  As a primary matter,
the S.J. case underscores the propriety of our finding that Defendant Murphy had reasonable
suspicion to stop Plaintiff.  To the extent Plaintiff relies on it to argue that Defendant Murphy's
search exceeded the reasonable scope of a Terry stop, his argument is misplaced.  In S.J., the
flash information indicated that an individual matching the detainee's description was selling
drugs, but did not suggest that she was armed or violent.  Id. at 1069.  Nor did the officers cite to
any conduct by the detainee which would lead them to believe that their safety was at risk.  Id. at
1071 n.2.  When police arrived on the scene, the detainee was talking with two other individuals
on a street.  Id. at 1072.  She merely "stared" at authorities and the two males in her company
stayed on the scene.  Id.  There were "no furtive attempts of concealment, no fleeing of the scene
and no other activity which would remove the [detainee's] behavior from that of an ordinary
citizen to that of a suspected criminal."  Id.

    To the contrary, in the case at bar, the flash information described the perpetrator as being
an armed criminal, who had just attempted a home invasion and robbery.  This information alone
created a reasonable belief that both the officer's and the public's safety were at risk.  This belief,
in turn, justified Officer Murphy's stop and frisk of Plaintiff to search for weapons, as well as his
continued detention of Plaintiff until a reasonable investigation could be completed to assure that
Plaintiff was not one of the suspects.

excessive force in the course of an investigatory stop or other "seizure" of a free citizen must be determined using a reasonableness test, giving careful attention to the facts and circumstances of each particular case, and recognizing that the use of some coercion necessarily inheres in the officer's right to make such an investigatory stop or seizure.  Id. at 396.  These facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.  As explained by the United States Supreme Court,

> The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . .  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. at 397 (internal citations omitted).  The "'reasonableness' of a particular use of force therefore must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Id. at 396-97.  Accordingly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"  Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

In Avery v. Mitchell, No. 98-CV-2487, 1999 WL 240339 (E.D. Pa. Apr. 20, 1999), a factually analogous case, the court found no constitutional violation of the prohibition against excessive force.  Specifically, an armed robbery occurred at a bookstore, and the defendant officers

immediately responded to a dispatch call describing the suspects as two black males, armed and wearing dark clothing.  Id. at *1.  Plaintiffs, two black males, were traveling in a Ford on a road nearby, and one of the defendant officers determined that the Ford's license plate was registered to a different vehicle.  Id.  Three police cars surrounded and stopped the car.  The defendant officers ordered plaintiffs out of the Ford and onto their knees in the middle of the roadway while they kept their guns trained on them.  Id.  The plaintiffs were frisked, handcuffed and placed in the back of two separate police cars.  Id.  One of the plaintiffs was actually directed to lie facedown on the highway, hands behind his back.  Id.  The officer put his knee in his back, handcuffed him "really tight," picked him up by his handcuffs and put him in the patrol car.  Id.  One of the officers searched the Ford and found no weapons or cash inside.  Id.  The plaintiffs provided all information, including their names, addresses and place of employment when questioned.  Id.  While detaining plaintiffs, the officers (1) investigated the proffered information and confirmed plaintiff's employment through dispatch, (2) retrieved a witness/victim from the bookstore for a possible identification of plaintiff, (3) performed more thorough searches of the Ford, and (4) retrieved a camera from the station house to photograph plaintiffs.  Id. The plaintiffs remained handcuffed during this time and one plaintiff said he complained of being very uncomfortable.  Id.  Although some discrepancy as to time existed, the detention lasted at least forty-nine minutes.  Id. at *1 n.2.

    The plaintiffs subsequently brought a section 1983 action against the officers alleging, in part, excessive force.  Denying this claim, the court held as follows:

> The reported crime was armed robbery. Based on the nature of the offense and Defendants' reasonable suspicion that Plaintiffs had committed this robbery, it was justifiable to stop Plaintiffs with guns drawn. The nature of the suspected offense also justified Defendants' handcuffing Plaintiffs. While Plaintiffs did not resist and did not attempt to flee, some aggression by Defendants was warranted given their

knowledge of the suspected crime and the possibility that Plaintiffs were armed and dangerous.

Id. at *5. Thus, the court found the plaintiff's excessive force claim meritless. Id.; see also Ankele v. Hambrick, No. 02-CV-4804, 2003 WL 21223821, at *10 (E.D. Pa. 2003) (where plaintiff denied involvement in motor vehicle accident and kept backing away from officer, officer's throwing of plaintiff against hood of car and handcuffing him may have been unnecessary, but was nonetheless not excessive where officer was confronted with an uncertain situation).

In the case at bar, the Court likewise finds that Plaintiff's allegations and supporting evidence do not survive summary judgment review. Describing the events of the day in question, Plaintiff testified fully regarding the extent of the officers' physical contact with him, as follows:

> A.   Oh.  By the time I got up against the wall, Officer Murphy had one hand on my arm and had me pushed – pressed up against the wall while he was patting me down.  And before I could turn around and look again, two other officers grabbed each arm and pinned me against the wall.
>
> * * *
>
> Q.   Was he holding your arm?  Did he have, like a grasp of your arm, or did he just have his arm on the back of you?
>
> A.   He had his arm like – so I couldn't go nowhere or do anything.  I was – which I wasn't trying to do anyway.  I was trying to see what was going on behind me.
>
> Q.   And you sort of gestured out that he had grabbed you.  Was he grabbing your jacket?
>
> * * *
>
> A.   It was a big jacket, so he – he had a grip on me.  If I was try [sic] to run, he could have easily stopped me.

(Brown Dep. 19:3-20:8.)

A.      They [the two unknown officers] had me – had both my arms up against the wall.  I mean one – one guy had this arm.  He had two hands.  He had both of his hands on one arm.  The other guy had me on the other wall – the other side of the wall with both my arms – with both his arms on one of my arms, and Officer Murphy was checking me and patting me down.

* * *

Q.      And you say when you would try to turn around –

A.      They would –

Q.      – they applied pressure – force?

A.      They pushed me up against – every time I tried to turn or something they would tighten their grip up.

Q.      And would they then push your arms towards the wall?

A.      Yes.

Q.      Did you at any point hit your face on the wall?

A.      No, because I had my hands up.

Q.      So they never pushed you far enough into the wall that your face or –

A.      Not my face, no.

Q.      Was your body up against the wall or just your hands?

A.      My hands, and I was spread up from the wall like that.

Q.      And when they would push in on you, like push you towards the wall, how would they push your arm if you can describe it for me?

A.      Well, I can't really – you know, it kind of hurt, but it – if I was – say I was here.  One of the officers had an arm like this and had me like this.  The other officer had me the same way.

Q.      Let me stop you for one second.  It seems like – you say one officer would have one of his arms around, like, your wrist area?

A.      On my shoulder.  See, I can't really – he had one arm up here and had me in some way where I couldn't move or they – I know he had two good grips on both arms.  They had both – they had me with two arms up against the wall.

Q.      Did they use any other – was there any other force used against you by police officers other than that pushing against the wall?

A.      And – well, basically, manhandling me I guess.  I wasn't a threat to them.  I was just trying to figure out what was going on.  And I was nervous, and they seemed to be real pissed at me for trying to turn around and figure out what was going on.

(Id. at 22:9-25:23.)

Q.      Did any of the officer twist your arm behind your back?

A.      No, sir.  They never twisted my arm.  Like I said, they just kept applying the pressure every time I would try to move or say something.  They were – they were real aggressive with me.

Q.      And they were trying to keep you and your hands against the wall?

A.      Keep me up against the wall.

Q.      At any point did any of the officers throw you to the ground?

A.      No, they didn't.  They didn't throw me to the ground.

(Id. at 26:16-27:5.)

21

Q.      Other than the pat down and where Sergeant Murray [sic] had a hold of your
        back or your jacket, you had a jacket on, did Sergeant Murphy have any other
        physical contact with you?

A.      He – like I said, he – he – he initiated it the first time.  He was the one.  And
        he – like, when I'd turn around, he would – he would make me turn back
        around.  He would push me or something.

Q.      While the other officers had both of your arms?

A.      Yes.

(Id. at 29:14-30:2.)  Based on these events, Plaintiff testified that he suffered injuries to his shoulder

and neck for which he received six months of treatment.  (Id. at 36:6-24, 41:17-19.)

        These assertions fail to substantiate an excessive force claim.  Plaintiff's own testimony

reveals that the officers physically did nothing more than hold him up against the wall and frisk him

for weapons – reasonable measures in light of the well-founded suspicion that Plaintiff was an

armed robber.  Although he testified that the officers kept shoving him against the wall, he admitted

that they did so only when he tried to turn around to see what was occurring behind him.  He did not

allege that they engaged in any unnecessary pushing or hitting, or otherwise attempted to hurt him.

The fact that he sustained minor injuries, while relevant in the totality of the circumstances, does not

alone equate to a constitutional violation.  See Nardini v. Hackett, No. 00-CV-5038, 2001 WL

1175130, at *6 (E.D. Pa. September 19, 2001) (mere fact of injury requiring physical therapy

resulting from detention did not cause otherwise reasonable force to rise to the level of excessive).

Given the circumstances at the time – the seriousness of the crime recently committed, the belief

that Plaintiff was armed and Plaintiff's repeated efforts to turn away from the wall which could have

been construed as attempts to resist – no reasonable juror could find that the severity of the force

22

was unreasonable or excessive.[6]  As Plaintiff has pointed to no genuine issue of material fact with

respect to the officers' use of force, the Court grants summary judgment on this claim.[7]

**B.      State Law Claims**

As Plaintiff's federal claims cannot survive summary judgment review, his sole remaining

causes of action allege tortious violations under Pennsylvania law, including assault, battery and

false imprisonment.  Again, however, the Court must grant summary judgment on these claims.

"To prove [a] claim of assault, under Pennsylvania law, [p]laintiff must show that a

particular [d]efendant intentionally caused an imminent apprehension of a harmful or offensive

bodily contact in [p]laintiff." Lakits v. York, 258 F. Supp.2d 401, 407 (E.D. Pa. 2003) (citations

omitted).  In other words, "[a]n assault is an intentional attempt by force to do an injury to the

person of another." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (quoting Cohen v. Lit

Bros., 70 A.2d 419, 421 (Pa. Super. 1950)).  "To prove [a] claim of battery, [a] [p]laintiff must

---

[6]  Plaintiff provides no other legal or factual basis for his claim alleging a right to be free
from summary punishment.  In light of our findings on the excessive force case, Plaintiff cannot
maintain a claim for summary punishment in violation of the Fourth Amendment.  See
Underwood v. Commonwealth of PA, No. 05-CV-3452, 2006 WL 1147563, at *4 n.1 (E.D. Pa.
Apr. 26, 2006) (noting that a claim alleging deprivation of freedom from summary punishment
has been interpreted as a Fourth Amendment excessive force claim in a case where the bases for
multiple constitutional claims was not entirely clear).

[7]  As an additional basis for his summary judgment motion, Defendant Murphy alleges
that he is entitled to qualified immunity for his actions on January 23, 2005.  The doctrine of
qualified immunity is intended to give ample room for reasonable but mistaken judgments by
police officers.  Hunter v. Bryant, 502 U.S. 224, 2217, 112 S. Ct. 534, 536 (1991).  If, however,
"no constitutional right would have been violated were the allegations established, there is no
necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194,
201, 121 S. Ct. 2151, 2156 (2001).  Since the Court has found no constitutional violation, we
decline to address this argument.

establish that a particular [d]efendant intended to cause a harmful or offensive contact to [p]laintiff, or an imminent apprehension of such contact in [p]laintiff, and that such contact with [p]laintiff resulted." Lakits, 258 F. Supp.2d at 407.  "[A] battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk, 641 A.2d at 293 (Pa. 1994) (quoting Cohen, 70 A.2d at 421).  In Pennsylvania, "[t]he reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." Renk, 641 A.2d at 293 (1994).  Finally, the elements of false imprisonment include (1) the detention of another person, and (2) the unlawfulness of such detention.  Renk, 641 A.2d at 293; Avery, 1999 WL 240339, at *11.

For the reasons previously discussed, Defendant Murphy's actions were reasonable and justified under the circumstances.  Accordingly, his conduct could not constitute either an assault or battery.  Moore v. Vangelo, 222 Fed. Appx. 167, 172 (3d Cir. 2007).  Likewise, there is no genuine issue of material fact as to the lawfulness of the detention since, as explained in detail above, it was based on reasonable suspicion.  The Court therefore grants summary judgment in favor of Defendant on these three claims.

## IV.    CONCLUSION

Having considered the evidence submitted by the parties in the light most favorable to Plaintiff, the Court finds no genuine issue of material fact upon which a reasonable juror could return a verdict in Plaintiff's favor.  Accordingly, the Court grants summary judgment in favor of Defendants and dismisses the Complaint in its entirety.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL BROWN                              :
                                          :        CIVIL ACTION
                    Plaintiff,            :
         v.                               :
                                          :
CITY OF PHILADELPHIA, et al.              :        NO.  07-0192
                                          :
                    Defendants.           :

## ORDER

AND NOW, this *29ᵗʰ* day of January 2008, upon consideration of the Motion of Defendants

City of Philadelphia and Officer Brian Murphy for Summary Judgment (Docket No. 5), Plaintiff's

Response (Docket No. 6) and Defendants' Reply Brief (Docket No. 8), it is hereby **ORDERED** as

follows:

1.    In light of Plaintiff's concession that he is unable to establish a claim of liability
      against Defendants City of Philadelphia and unidentified officers Doe and Roe,
      Plaintiff's Complaint against them is **DISMISSED**;

2.    Defendant Officer Murphy's Motion for Summary Judgment is **GRANTED**;

3.    **JUDGMENT** is **ENTERED** in favor of Defendant Officer Murphy and against
      Plaintiff.  This case is closed.

BY THE COURT:


*s/ Ronald L. Buckwalter, S. J.*

RONALD L. BUCKWALTER, S.J.